UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEQUARIUS D. FITZPATRICK,

                Plaintiff,

     v.                                   Case No. 17-C-101, 17-C-102

SGT. VERHEYEN, *et al.*,

                Defendants.

---

**DECISION AND ORDER GRANTING-IN-PART AND DENYING-IN-PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

      Plaintiff Dequarius Fitzpatrick, an inmate currently serving a state prison sentence at Green

Bay Correctional Institution (GBCI) and representing himself, filed this action under 42 U.S.C.

§ 1983, alleging that sixteen defendants[1] were deliberately indifferent to a serious risk of harm to him

when he injured himself on August 31, 2016, and October 17, 2016.[2] This matter comes before the

court on the defendants' motion for summary judgment. ECF No. 48. Also before the court are

Fitzpatrick's motion for summary judgment (ECF No. 77), the defendants' motion to strike

Fitzpatrick's summary judgment motion (ECF No. 83), and Fitzpatrick's motions for leave to file

sur-replies to the defendants' reply brief in support of their motion for summary judgment (ECF

---

     [1] A seventeenth Defendant, John Kind, is also named on the docket. However, there is no
dispute that Fitzpatrick's only claim against Kind was a conspiracy claim dismissed at screening.
Def.'s Proposed Findings of Fact (DPFOF) ¶ 14, ECF No. 49. Consequently, Kind will be dismissed
as a party, and this order will address only Fitzpatrick's claims against the remaining sixteen
defendants.

     [2] Although Fitzpatrick originally filed separate suits regarding the August and October 2016
incidents, the court entered an order consolidating them at screening. ECF No. 12.

No. 89) and to the defendants' reply to his response to their proposed statement of undisputed facts (ECF No. 90). For the reasons stated below, the defendants' motion for summary judgment will be granted-in-part and denied-in-part, Fitzpatrick's motions for leave to file sur-replies will be granted, the defendants' motion to strike will be denied, and Fitzpatrick's motion for summary judgment will be denied.

## BACKGROUND

The following background facts are taken from the undisputed portions of the defendants' proposed findings of fact. At all times relevant to this case, Fitzpatrick was an inmate in the Restrictive Housing Unit (RHU) at GBCI, and each defendant was employed as either a correctional officer, a sergeant, or a supervising officer on the RHU. Def.'s Proposed Findings of Fact (DPFOF) ¶¶ 1–3, ECF No. 49.

Around 11:00 a.m. on August 31, 2016, Fitzpatrick cut his arm open approximately 7 times with a razor blade. *Id.* ¶ 36. It was the first time he had ever cut himself in prison. *Id.* ¶ 37. A psychologist placed Fitzpatrick on observation status as a precautionary measure, and around 1 p.m., Fitzpatrick received treatment in the Health Services Unit (HSU). *Id.* ¶¶ 40–42. Treatment notes from the HSU show that the cuts were "very superficial," there was no "active bleeding," and Fitzpatrick was in an "agreeable" mood. *Id.* ¶¶ 41–42 (citing ECF No. 54-8 at 25–26). Although no additional incident reports were recorded for Fitzpatrick on August 31, Defendant Michael Verheyen did confiscate a razor from him around 4:30 p.m., at which time Verheyen observed blood around one of Fitzpatrick's wounds from earlier in the day. *Id.* ¶¶ 44, 68; *see also* Pl.'s Response to DPFOF ¶ 68, ECF No. 82. Fitzpatrick alleges that Verheyen, as well as Defendants John Afolabi, Shane Brunner, John Deidrick, Chris Delfosse, James Elsinger, Alexander Laplant, Alejandra Mejia,

Julio Ramirez, and David Yang were all deliberately indifferent to the serious threat that he posed to himself and failed to protect him from himself throughout the day.

Several weeks later, on October 17, 2016, Fitzpatrick cut himself with a disposable plastic spoon shortly before 2:22 p.m. DPFOF ¶¶ 70, 74. Once again, he was placed on clinical observation status and his wound was treated in the HSU. *Id.* ¶¶ 76–77. Progress notes from the HSU show that, when he was treated at 2:30 p.m., his "pea sized" wound was not actively bleeding and could be closed by 2 steri-strips. *Id.* ¶ 76 (citing ECF No. 54-8 at 23). During the 6 o'clock hour that evening, Fitzpatrick reopened the wound and squeezed his arm to smear blood, culminating in a 6:55 p.m. return to the HSU, where his wound was cleaned, closed with 3 steri-strips, and covered with gauze. *Id.* ¶¶ 88–89 (citing ECF No. 54-8 at 23–24). Fitzpatrick was returned to observation status, and an officer observed that he was bleeding again as early as 10:05 p.m. *Id.* ¶¶ 91–92. This time, his wound did not require treatment in the HSU, the wound was again closed with steri-strips, and Fitzpatrick was placed in restraints. *Id.* ¶ 95; *see also* ECF No. 54-8 at 21. Similar to his claims regarding the August 31 incident, Fitzpatrick alleges that Defendants Kyle Peotter, Darren Larkin, Andrew Wickman, Michael Eichstedt, Raymond Koehler, Michael Schultz, and Alejandra Mejia were all deliberately indifferent to the danger he posed to himself throughout the day on October 17.

Additional undisputed factual information regarding the actions of the individual defendants will be set forth in greater detail as necessary as part of the analysis that follows.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party.

*Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoted source and internal quotation marks omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation mark omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### I. Fitzpatrick's Motions to File Sur-Replies

As a preliminary matter, Fitzpatrick has filed two motion seeking leave to file a sur-reply to the defendants' reply brief supporting their own motion for summary judgment (ECF No. 89) and a sur-reply to the defendants' reply to his response to their proposed statement of undisputed facts (ECF No. 90). Consistent with Civil Local Rule 7(i), Fitzpatrick filed his proposed sur-reply briefs simultaneously with his motions. Whether to grant a party leave to file a sur-reply brief is a question within the court's discretion. "The decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Merax-Camacho v. United States*, 417 F. App'x 558, 559 (7th Cir. 2011) (citing *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 n.2 (7th Cir. 2010)). "In some instances, allowing the filing of a surreply 'vouchsafes the aggrieved party's right to be heard and provides the court with the information necessary to make an informed decision.'" *Univ.*

*Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 922 (N.D. Ill. 2014) (quoting *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 320, 329 (N.D. Ill. 2005)). Fitzpatrick's motions for leave to file sur-reply briefs will be granted, as the proposed filings will assist the court in evaluating his claims.

## II. Deliberate Indifference

A plaintiff may prevail on a claim for relief under 42 U.S.C. § 1983 by showing that he was (1) deprived of a federal right (2) by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Chatham v. Davis*, 839 F.3d 679, 684 (2016) (alterations in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). " A prison official may be liable for deliberate indifference only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "A § 1983 claim based upon a violation of the Eighth Amendment has both an objective and a subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

An inmate alleging deliberate indifference must "show that the defendants actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). The Seventh Circuit has elaborated on the nature of this high standard:

> Deliberate indifference requires a showing of "more than mere or gross negligence, but less than the purposeful or knowing infliction of harm." We have characterized the required showing as "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." To establish deliberate indifference, a plaintiff must present evidence that an individual defendant intentionally disregarded the known risk to inmate health or safety. A defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] . . . his action must be reckless before § 1983 liability can be found."

*Collins*, 462 F.3d at 762 (citations omitted; alterations in original) (first quoting *Matox ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); then quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992); and then quoting *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003)).

Seventh Circuit precedent also provides guidance for applying these standards in the context of prisoners who harm themselves. "Where the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Id.* at 761. For a prison official to satisfy the subjective knowledge prong of this standard, "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)). This means that "the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life." *Id.* The absence of a diagnosed mental illness that prompts an inmate's self-harming behavior is not fatal to a deliberate indifference claim in the self-harm context. *See Taylor v. Wausa Underwriters Ins. Co.*, 423 F. Supp. 2d 882, 889 (E.D. Wis. 2006) (first citing *Boncher ex rel. Boncher v. Brown Cty.*, 272 F.3d 484, 486 (7th Cir. 2001); then citing *Novack*, 226 F.3d at 531–32). At the same time, "[p]redicting suicide is impossible," and a prison

official's "[f]ailure to prevent a given suicide attempt does not necessarily show the lack of care."

*Myers v. Cty. of Lake, Ind.*, 30 F.3d 847, 851 (7th Cir. 1994).

Against this backdrop, the undisputed facts show that Fitzpatrick cannot succeed on the majority of his deliberate indifference claims with regard to either the August 31, 2016 incident or the October 17, 2017 incident. Regarding the August 31 incident, the undisputed facts show that Fitzpatrick did not interact with six of the defendants until *after* he had received treatment for harming himself, meaning he did not suffer from a serious medical need toward which they could exhibit indifference. As for the four defendants with whom Fitzpatrick interacted before harming himself, disputes of material fact exist only with regard to whether two—Brunner and Ramirez—possessed the subjective knowledge necessary to be liable for deliberate indifference. With regard to Fitzpatrick's October 17 claim, the undisputed facts show that none of the seven defendants exhibited subjective indifference towards a risk that he would harm himself.

## A. The August 31, 2016 Incident

### 1. Interactions Prior to Fitzpatrick's Injury

Prior to cutting his arm on the morning of August 31, Fitzpatrick interacted with four defendants: John Afolabi, Shane Brunner, Alejandra Mejia, and Julio Ramirez. While Brunner and Ramirez passed out breakfast trays that morning, Fitzpatrick told them that he wanted to speak with the Psychological Services Unit (PSU) because he was having suicidal thoughts, and Ramirez responded that PSU "is not here" as they continued on from his cell. DPFOF ¶¶ 20–21. Fitzpatrick did not say anything to them when they picked up his tray 20 minutes later. *Id.* ¶ 22. When Brunner and Ramirez returned to pass out lunch trays, Fitzpatrick again asked them to call PSU because he was going to harm himself, to which Ramirez responded, "Don't talk about it, be about it," before

continuing to pass out trays. *Id.* ¶¶ 33–34. They returned later to pick up Fitzpatrick's lunch tray, at which time Fitzpatrick told them that he had a razor blade, which he also showed to them, but Brunner and Ramirez continued down the range to pick up trays from the other inmates. *Id.* ¶ 35. Shortly afterwards, at approximately 11 a.m., Fitzpatrick covered the window to his cell and cut his arm 7 times. *Id.* ¶ 36.

Also that morning, separate from breakfast and lunch tray distribution, Fitzpatrick pushed the emergency call button in his cell approximately twenty times between 9:30 and 10 a.m. *Id.* ¶ 23. Fitzpatrick believes that Mejia answered his call at 9:30 a.m. and that Afolabi answered it at 10:30 a.m. *Id.* ¶ 24. He told them both that he wanted to see the PSU and that he was feeling suicidal, but he had not yet cut himself and he did not tell either of them that he had a razor. *Id.* ¶ 25. Moreover, Fitzpatrick was not on any restrictions on August 31, meaning that it was not cause for alarm if he possessed items like pen inserts, spoons, and plastic bottles that he could fashion into instrumentalities to harm himself. *Id.* ¶ 28. Mejia instructed him to submit a PSU request slip, but Fitzpatrick declined to do so because, he says, he did not feel like he would be alive in one or two days when the PSU would finally be able to see him. *Id.* ¶ 27.

Based on those undisputed facts, no jury could reasonably find that Mejia or Afolabi subjectively knew that Fitzpatrick was at substantial risk of harming himself that morning. Merely informing them of his desire for services from the PSU was not enough to give either of them subjective knowledge of a serious risk that Fitzpatrick would injure himself. Although Fitzpatrick did also tell both Mejia and Afolabi that he was feeling suicidal, it is not uncommon for inmates to ask to see PSU, threaten to harm themselves, say they are suicidal, and shout things at correctional officers who are walking by their cells. DPFOF ¶¶ 11–15; *see Collins*, 462 F.3d at 761 ("[A] request

8

to see a crisis counselor, standing alone, is not sufficient to put a defendant on notice that an inmate poses a substantial and imminent risk of suicide."). Given that Fitzpatrick had no history of actually harming himself or any restrictions limiting the objects he could possess, the lack of response to his statements, aside from Mejia's instruction to fill out a PSU form, does not reflect deliberate indifference. *See Novack*, 226 F.3d at 530 ("[S]trange behavior alone, without indications that that behavior has a substantial likelihood of taking a suicidal turn, is not sufficient to impute subjective knowledge of a high suicide risk to jail personnel."). The defendants' motion for summary judgment will therefore be granted as to Mejia and Afolabi.

Considering the record in the light most favorable to Fitzpatrick as the non-moving party, however, a dispute of material fact exists with regard to whether Brunner and Ramirez exhibited deliberate indifference to a risk that Fitzpatrick posed to himself that morning. Not only did Fitzpatrick tell them that he was feeling suicidal, he also states that told them that he possessed a razor and actually showed it to them, indicating that they were subjectively aware that he possessed an instrumentality that he could use to seriously injure or even kill himself. Indeed, Ramirez seemingly went so far as, apparently, *encouraging* Fitzpatrick to harm himself when he said, "Don't talk about it, be about it." Such a comment to an inmate who possesses a razor and says he is feeling suicidal reflects a reckless attitude toward the threat that the inmate seemingly represents to himself. *Cf. Taylor*, 423 F. Supp. 2d at 889 ("The idea that jail guards could intentionally stand by, or even cheer, while an inmate who is under the stress of being accused of a crime and experiencing the pain of separation from family and friends, as well as the fear, isolation and hopelessness that are commonplace in prison, attempts to take his own life is shocking to any civilized person.").

Because a jury could reasonably conclude that Ramirez and Brunner were deliberately indifferent to a serious risk of harm to Fitzpatrick, the defendants' motion for summary judgment will be denied as to them. And because a dispute of material fact exists as to the precise information that Brunner and Ramirez possessed as to the extent of any threat that Fitzpatrick posed to himself, Fitzpatrick's motion for summary judgment will also be denied as to these two defendants.

### 2. Interactions After Fitzpatrick's Injury

Fitzpatrick raises claims against an additional six defendants for their actions on August 31: John Deidrick, Chris Delfosse, James Elsinger, Alexander Laplant, Michael Verheyen, and David Yang. While Fitzpatrick was on observation status on the afternoon of August 31—meaning prison staff were supposed to observe him at least every 15 minutes—Deidrick observed him on several occasions, and there is no dispute that Fitzpatrick told him he was suicidal and possessed a razor multiple times during those observations. DPFOF ¶¶ 46–50, 82. Also that afternoon, Fitzpatrick interacted with Delfosse, Laplant, and Yang as they passed out clothes and towels as part of the RHU's shower process; he told all three of them that he felt suicidal, had a razor, and wanted to be strapped down. *Id.* ¶¶ 54–57. Fitzpatrick interacted with Elsinger only once, around 3 p.m., when he claims that he told Elsinger that he had a razor and actually showed it to him. *Id.* ¶ 65. As for Verheyen, he responded to Fitzpatrick's cell around 3 p.m. because Fitzpatrick was banging on his door, and Fitzpatrick showed him the razor and asked to be strapped down. *Id.* ¶¶ 60–61. At some point that afternoon, Verheyen returned to Fitzpatrick's cell and demanded that Fitzpatrick give up the razor; Fitzpatrick complied. *Id.* ¶ 68. Verheyen observed blood around one of Fitzpatrick's wounds from earlier in the day, which he believed occurred because Fitzpatrick had been picking at it. *Id.* (citing ECF No. 54-15 at 2).

Crucially, the blood from Fitzpatrick's reopened wound, as observed by Verheyen, was the *only* "harm" that followed Fitzpatrick's interactions with any of these six defendants while on observation status during the afternoon of August 31. Fitzpatrick does not dispute that when Deidrick, Delfosse, Laplant, Yang, and Elsinger interacted with him, he was neither actively bleeding nor cutting himself. *Id.* ¶¶ 50, 59, 65. The Seventh Circuit has acknowledged that a prison official's "[f]ailure to 'dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue . . . does not . . . violate the Constitution.'" *Zentmyer v. Kendall Cty.*, 220 F.3d 805, 810 (7th Cir. 2000) (last alteration in original) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)). The fact that Verheyen observed blood around Fitzpatrick's wound later in the afternoon does not mean that Fitzpatrick sustained a serious injury that renders these defendants liable for deliberately failing to intervene to protect him from himself. To the contrary, any bleeding from an existing wound was a de minimis "injury" that cannot provide the basis for a deliberate indifference claim. *See Cooper*, 97 F.3d at 917 (observing that the first prong of the deliberate indifference standard is met only if "the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized"). Fitzpatrick's claims against these six defendants will therefore also be dismissed.

## B. The October 17, 2016 Incident

On October 17, 2016, Fitzpatrick harmed himself again shortly before 2:22 p.m., and he brings claims against seven defendants for their alleged inaction before and after the incident: Kyle Peotter, Darren Larkin, Andrew Wickman, Michael Eichstedt, Raymond Koehler, Michael Schultz, and Alejandra Mejia.

11

Considering first Peotter and Larkin, Fitzpatrick interacted with both during the medication and breakfast passes on October 17, telling them that he wanted to see PSU. DPFOF ¶ 72. Both said that they would let someone know about Fitzpatrick's request, but they also both walked away when Fitzpatrick asked if they had done so when they returned at lunch. *Id.* Although Fitzpatrick did not have a weapon at the time that he saw them (he had not yet fashioned the spoon into a weapon), he did say that he was about to cut his arm open. *Id.* ¶¶ 71–72. Nonetheless, these are not facts from which a jury could reasonably infer that Peotter and Larkin were aware that Fitzpatrick posed a substantial risk of serious harm to himself. They had no knowledge that Fitzpatrick possessed the spoon or any other instrumentality that he could use to harm himself, and he did no more than ask to speak with PSU staff. *See Collins*, 462 F.3d at 761. Moreover, to the extent that Fitzpatrick said that he was feeling suicidal, Peotter also notified both his Sergeant, Mejia, as well as a member of the PSU staff regarding Fitzpatrick's desire to speak with PSU. DPFOF ¶ 73 (citing ECF No. 53 ¶¶ 8–10). Fitzpatrick's claims against Peotter and Larkin will therefore be dismissed.

Turning to Fitzpatrick's claims against Wickman and Eichstedt, Wickman responded to Fitzpatrick's cell shortly after 2:30 p.m. *Id.* ¶ 75 (citing ECF No. 54-13 at 3). Around 2:22 p.m., a non-defendant received a call from Fitzpatrick's emergency call button (for which the unit's call log says that Fitzpatrick stated, "I cut myself real bad"), and another non-defendant responded to Fitzpatrick's cell around 2:30 p.m., at which time the second non-defendant radioed for Wickman to respond to Fitzpatrick stabbing his arm with the spoon. *Id.* Wickman called for immediate medical attention, and Fitzpatrick was removed from his cell for treatment in the HSU. *Id.* ¶¶ 75–75. Wickman also responded when Fitzpatrick reopened his wound at 6:03 p.m., and Fitzpatrick was

removed from his cell for treatment by the HSU around 6:43 p.m. *Id.* ¶ 88. In the interim 40 minutes, Fitzpatrick squeezed blood out of his wound and spread it around the cell. *Id.* Both Wickman and Eichstedt were present for Fitzpatrick's examination by HSU staff, during which time he said that he would hurt himself again if he were not strapped down in physical restraints. *Id.* ¶ 90.

Fitzpatrick raises two claims based on these interactions. First, he asserts that Wickman was deliberately indifferent to his serious risk of harm to himself by delaying 40 minutes between when he responded at 6:03 and when Fitzpatrick was removed from his cell at 6:43. But this delay was consistent with GBCI policy prohibiting an individual officer from entering an inmate's cell alone, meaning Wickman and the security personnel needed time to assemble an entry team to ensure their own safety and that of other inmates in the RHU. *Id.* ¶ 102. There is no dispute that Wickman acted promptly to obtain medical care for Fitzpatrick earlier in the day, and Fitzpatrick's vital signs were all normal when he ultimately went to the HSU after the 6:03 incident (*id.* ¶ 89), indicating that any injury from the reopened wound was not life-threatening during this second incident. Because Fitzpatrick's wound was not life-threatening, no reasonable jury could find that Wickman was deliberately indifferent to Fitzpatrick's needs by waiting to enter his cell until an extraction team was ready.

Second, Fitzpatrick contends that Wickman and Eichstedt were deliberately indifferent by failing to strap him down and physically restrain him after he reopened his wound at 6:03 p.m. Any prison staff member may recommend that an inmate be placed on observation or, more seriously, physical restraint, but only Psychologist Supervisors, Licensed Psychologists, Psychological Associates, Crisis Intervention Workers, Physicians, and Wardens have the authority to order that an inmate be placed on observation or restrained. *Id.* ¶ 80. Although Wickman and Eichstedt were

present while Fitzpatrick was being treated by HSU staff after the 6:03 p.m. incident, they did not have the authority to order that Fitzpatrick be placed in restraints. *Id.* ¶ 90. Indeed, a Licensed Psychologist employed at GBCI opined that, based on the record, physical restraints were not necessary for Fitzpatrick even after he reopened his wound at 6:03 p.m. *Id.* ¶ 86 (citing ECF No. 51 ¶¶ 14). Wickman and Eichstedt could reasonably defer to that medical opinion. *Askew v. Davis*, 613 F. App'x 544, 548 (7th Cir. 2015) (citing *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)). What is more, Fitzpatrick was on observation status between the 6:03 p.m. incident and the 10:05 p.m. incident (DPFOF ¶¶ 77, 92 (citing ECF No. 54-7 at 2–4)), meaning Wickman and Eichstedt had no reason to believe that he possessed an object that he could use to carry out his threats of harm to himself, and they knew that other officers were watching him consistently. Fitzpatrick's claims against Wickman and Eichstedt will therefore also be dismissed.

Finally, Fitzpatrick had no more than incidental contact with Koehler, Schultz, and Mejia on October 17, and no reasonable jury could find that any of their actions amounted to deliberate indifference. A non-defendant correctional officer observed that Fitzpatrick had reinjured himself at 10:05 p.m., but Koehler (the non-defendant officer's supervisor) did not report to Fitzpatrick's cell to remove him for treatment until 10:50 p.m. DPFOF ¶ 94. Even assuming Koehler knew about Fitzpatrick's injuries that entire time, any deliberate indifference claim against him fails for the same reason that Fitzpatrick's delay claim against Wickman fails: institutional security concerns place limits on an individual correctional officer's ability to enter an inmate's cell such that a delay in providing treatment does not necessarily suggest deliberate indifference.

As for Schultz and Mejia, Fitzpatrick merely shouted to each of them as they were completing other tasks on the unit. Before lunch that morning, while Schultz was delivering conduct

reports to other inmates in the RHU, Fitzpatrick shouted at him, "Hey, I'm suicidal, I need to talk to PSU, I'm going to harm myself." *Id.* ¶ 96. Fitzpatrick did not yet have a weapon and was not bleeding, but Schultz came over to Fitzpatrick's cell and said, "Right now I'm handling a ticket, but I'm going to let somebody know." *Id.* ¶ 97. Later, when Fitzpatrick was in the strip cage after harming himself, Schultz stopped by and said, "Fitzpatrick, why would you do this? I told you I was going to—I told you I was going to handle it." *Id.* ¶ 99. Around the same time as his initial interaction with Schultz, Fitzpatrick shouted out to Mejia as she escorted another prisoner to a conduct report hearing. *Id.* ¶ 103. He yelled that he was suicidal and wanted to talk to PSU; as she continued on with the other inmate, Mejia responded that Fitzpatrick's regular wing officers (Peotter and Larkin) would handle it. *Id.* ¶¶ 103–04.

These incidental shouts to Schultz and Mejia as they passed by Fitzpatrick's cell do not create a basis for a deliberate indifference claim based on his subsequent harm to himself. In a noisy prison environment, a prisoner's shouts to a correctional officer passing by his cell do not provide that officer with the subjective knowledge necessary to support a deliberate indifference claim. *Cf. Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Burks's view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right."). Furthermore, Mejia reminded Fitzpatrick of the proper officers to inform about his concerns, and Schultz actually told Fitzpatrick that he would convey Fitzpatrick's concerns to appropriate individuals, indicating that neither Mejia nor Schultz exhibited complete disregard

even for Fitzpatrick's incidental shouts. The fact that Fitzpatrick harmed himself before Schultz could help him does not convert Schultz's delayed action into indifference. Fitzpatrick's claims against Mejia and Schultz will therefore also be dismissed.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment (ECF No. 48) is **GRANTED-IN-PART and DENIED-IN-PART**. Defendants Verheyen, Afolabi, Deidrick, Delfosse, Elsinger, Laplant, Mejia, Yang, Eichstedt, Peotter, Larkin, Koehler, Schultz, Wickman, and Kind are all **DISMISSED**, but Fitzpatrick may proceed to trial on his claims against Defendants Brunner and Ramirez. Fitzpatrick's motions for leave to file sur-replies to the defendants' reply brief in support of their motion for summary judgment (ECF No. 89) and to the defendants' reply to his response to their proposed statement of undisputed facts (ECF No. 90) are both **GRANTED**. Fitzpatrick's motion for summary judgment (ECF No. 77) is **DENIED**. Because Fitzpatrick's motion for summary judgment is denied, the defendants' motion to strike that motion as untimely (ECF No. 83) is **DENIED** as moot. The Clerk is directed to set this matter for a telephone conference to discuss scheduling a trial date.

**SO ORDERED** this 13th day of July, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court